The National City Bank of Ottawa, Illinois, Appellee, v. Fred P. Cowdin and Margaret B. Cowdin, Appellants.

Gen. No. 8,343.

Opinion filed April 22, 1930.

Doyle, Sampson & Giffin, for appellants.

Masters & Masters and Walter T. Day, for appellee.

Mr. Justice Shurtleff delivered the opinion of the court.

We subjoin a portion of the chancellor's statement of the case in the court below:

On August 8, 1923, Fred P. Cowdin acquired title to lot 49 in Oak Knolls Second Platt in the City of Springfield. At that time and other times subsequent thereto, he told his wife he intended to build a residence on the lot and when completed, he would convey the property to her.

Cowdin is a practicing physician and surgeon. His practice nets about $10,000 a year. In November, 1925, the erection of the dwelling house began and it was completed in June, 1926, at a cost of approximately $30,000. During the progress of the construction, he and his wife executed and delivered to the defendant Fayart, a mortgage to secure an indebtedness of $15,000. On May 20, 1926, or approximately one month after the completion of the building, he conveyed it by warranty deed to his wife, without any

money consideration. Shortly thereafter, he and his family occupied the premises as their home.

Several years prior to the execution of the deed, Doctor Cowdin, together with a number of other men, became associated together in a corporation known as the American Magnestone Corporation, for the purpose of manufacturing a building material known as "stucco." Doctor Cowdin was one of the directors. For a time the principal office of the corporation was at Ottawa, Illinois. The record discloses that the corporation proved itself to be an unsuccessful venture for its stockholders. It became largely indebted to banks in Springfield and to the appellee, The National City Bank of Ottawa. Such was the financial condition and stress of the corporation, that in order to maintain it as a going concern, some of the directors, including Doctor Cowdin, indorsed, guaranteed and otherwise secured the obligations of the corporation at the banks. In this course of conduct, Doctor Cowdin became involved, on account of direct and contingent liabilities, far in excess of his financial worth. His liability in direct obligations was $32,000 and his direct or contingent liability amounted to $28,000. This was the situation at the time he executed the deed to his wife. An examination of the record in this case will bring all minds to the conclusion that the corporation was insolvent in May, 1926; that its insolvency was known to all of the directors, including Doctor Cowdin; that he was alarmed about the condition of affairs and expressed himself as intending to convey his residence property and provide his wife a home, "if worse came to worse." Doctor Cowdin's intent to protect his wife and family against the hazards of an unsuccessful business in which he was engaged is thoroughly established by the proof in the case.

As early as 1924 the American Magnestone Corporation was indebted to The National City Bank of

Ottawa, but it was not until March 2, 1927, almost a year after the execution of the deed, that Doctor Cowdin became personally obligated to the bank on account of the indebtedness of the American Magnestone Corporation. On December 19, 1927, he became personally liable to the appellee on a judgment note executed by him. Judgment by confession was entered against him on that note under warrant of attorney in the sum of $4,528.12 and costs. An execution was issued on said judgment and was returned *nulla bona.* The bill in this case was filed by appellee in aid of an execution and seeks to have the deed from Doctor Cowdin to his wife declared void on the ground that it was a voluntary conveyance made in secret trust for the benefit of the grantor, and to hinder, delay and defraud his creditors. The master found the facts to be very much the same as above stated but he further found and held that Doctor Cowdin did not intend by said conveyance to defraud the appellee in particular, or future creditors in general; that the evidence did not show that Cowdin expected to become indebted on new obligations in the future, and that the conveyance was not merely colorable and a secret trust for the benefit of the grantor, but was intended as an absolute conveyance. He recommended that a decree be entered dismissing the bill for want of equity. Objections to the master's report were filed by the appellee and also by appellants Fred P. Cowdin and Margaret B. Cowdin. Such objections having been overruled, the report was duly filed and exceptions thereto were filed by the appellee and separate exceptions by the appellants, Margaret B. Cowdin and Fred P. Cowdin.

Going more particularly into the affairs of appellant Fred P. Cowdin, the master's report shows:

That at the time of said transfer (May 20, 1926), the said Fred P. Cowdin's indebtedness was as follows:

To the First National Bank of Springfield, on a note in the sum of $3,100, secured collaterally by one hundred shares of stock of the American Magnestone Corporation.

To the Springfield Marine Bank, on a note in the sum of $6,000, secured collaterally by 125 shares of stock of the American Magnestone Corporation and by other stocks and bonds which latter stocks and bonds were afterwards sold by the said bank and the proceeds applied on said $6,000 indebtedness, leaving a balance of $500 unpaid on this indebtedness at the time of the hearing.

To the Springfield Marine Bank as one of five guarantors, namely, George B. Smith, J. W. Zollars, Don Deal and A. E. Prince, of an obligation in the sum of $10,000 of the American Magnestone Corporation.

To the said Springfield Marine Bank as a joint maker of a note together with said George B. Smith, A. E. Prince, Don Deal and one C. S. Dines, in the sum of $4,500, which note was collaterally secured by 153 shares of the said American Magnestone Corporation stock.

To the said Springfield Marine Bank on a note in the sum of $3,775 signed or indorsed by the American Magnestone Corporation, C. S. Dines, George B. Smith, Don Deal and Fred P. Cowdin.

To the Springfield Marine Bank on a note in the sum of $10,000 signed by the said George B. Smith, C. S. Dines, M. P. McCarthy and Fred P. Cowdin, which note was collateral secured by 130 shares of stock of the George B. Smith Chemical Works, Incorporated.

To the Springfield Marine Bank, in the sum of $2,-350 on a note executed by the said C. S. Dines and

indorsed by the said Dines, George B. Smith and Fred P. Cowdin.

To the Ridgely Farmer's Bank on a note in the sum of $1,500, executed by the said M. P. McCarthy, as principal and by the said Fred P. Cowdin as surety.

To the Merchants and Manufacturers Securities Company of Chicago, on a guarantee signed by said Fred P. Cowdin, American Magnestone Corporation, George B. Smith and M. P. McCarthy, to reimburse said company for any losses on moneys advanced by it on accounts to the American Magnestone Corporation under contract between them; that at the time of the conveyance said company had advanced to the American Magnestone Corporation the sum of $17,452.43 and held for such advancement $22,000 worth of accounts of the American Magnestone Corporation, which last mentioned accounts were, however, all subsequently collected, but that later additional sums were advanced under said contract and guarantee and additional accounts of the American Magnestone Corporation turned over to the said Securities Company, and that at the time of the hearing there was due and unpaid the said Securities Company from the said American Magnestone Corporation, the payment of which was guaranteed by the above named parties, the sum of $25,432.12.

After said conveyance, on April 20, 1927, Fred P. Cowdin executed and delivered a note to the George B. Smith Chemical Works, Incorporated, for $3,500, due six months after date, being the amount assumed by him of a $15,000 obligation in favor of the said George B. Smith Chemical Works, Incorporated, existing at the time of the conveyance, to which obligation he was a joint signer, together with the said George B. Smith, Don Deal, C. S. Dines and M. P. McCarthy; that at the time of the conveyance aforesaid the said Fred P. Cowdin had the following assets:

Deposits in Springfield banks, subject to check, $634.50. One lot in West Grand Place worth approximately $1,000, two bonds in the Conover-McHenry Elevator Company, worth approximately $700; accounts receivable for professional services as a physician and surgeon $13,000, one-half of which were collectible and from which would necessarily have to be deducted the cost of collection; 275 shares of stock of the American Magnestone Corporation, having a par value of $100 per share, but for which there was no market and which afterwards in a little over a year turned out to be worthless; that the yearly average income of the said Fred P. Cowdin as physician and surgeon during the last three years has been approximately $10,500 a year; that the said Fred P. Cowdin had been one of the directors of the said American Magnestone Corporation for six or seven years prior to the fall of 1927, when he resigned as such director; that the notes given by him as aforesaid to the appellee were given it by the said Cowdin and other notes by other directors at the same time to cover in part overdrafts of the American Magnestone Corporation at said bank; that the indebtedness at the time of the conveyance aforesaid of the said American Magnestone Corporation to the appellee bank was direct $32,132.07, indirect $28,689.83; that the premises conveyed to Mrs. Cowdin, as aforesaid, cost the Cowdins upwards of $30,000 and that the cash market value thereof now is about $25,000; that said premises are now and were at the time of the conveyance encumbered by a mortgage indebtedness of $15,000; that the said Fred P. Cowdin at the time of the conveyance aforesaid did not retain sufficient property to pay his obligations and was in fact then and is now insolvent, although at the time of the conveyance he may have believed himself solvent; that at the time of the conveyance the said Fred P. Cowdin was apprehensive

that the American Magnestone Corporation might fail and that he might not be able to pay the indebtedness for which he had obligated himself and apparently made the conveyance to provide his wife a home in case of a crisis.

However, the evidence is insufficient to establish that Cowdin intended by said conveyance either to defraud the appellee specifically or future creditors in general, or that he expected to become indebted on new obligations in the future. The evidence is further insufficient to warrant the conclusion that the conveyance was and is merely colorable and a secret trust for the benefit of the grantor; it rather appears that as between the grantor and grantee, the intention was that the conveyance be absolute and beyond recall.

The master recommended a decree dismissing the bill for want of equity. Under this state of facts the chancellor sustained exceptions to the master's conclusions and entered a decree granting the prayer of appellee's bill and appellants have brought the record, by appeal, to this court for review.

Dr. Prince, one of appellant's associates, testified that Dr. Cowdin (appellant) stated to him that he made the conveyance to protect himself and George B. Smith; that Dr. Cowdin stated he was undertaking to protect himself by making the transfer, and upon a reading of the entire record there can be no question but that, at the time the transfer was made, appellant Cowdin was, in fact, insolvent. He knew better than anyone else that he was engaged in a new and hazardous business, the risks of which he was more than willing should be cast upon his associates and creditors, and he intended that the home should be preserved for his wife and himself in any event. Appellant knew that the Magnestone Corporation had no credit and could obtain funds to keep the corporation afloat only by pledging the individual notes of the promoters, and

appellant further knew that his own notes were pledged to that end far beyond his individual means with which to pay.

It is argued that the grantee had no motive to defraud anyone in accepting the title to the premises and therefore the conveyance cannot be set aside. In cases of voluntary transfers from husband to wife the intent with which the grantee accepts the conveyance is immaterial. (*Marmon v. Harwood,* 124 Ill. 104; *Clark v. Harper,* 215 Ill. 24, 32; *Higgins v. Higgins,* 219 Ill. 146, 151 and *Jarvis v. Jarvis,* 286 Ill. 478, 482.)

The law is that subsequent creditors may attack and impeach a prior conveyance where it is shown that the grantor had an intent to hinder, delay or defraud existing creditors, or where by a voluntary transfer to one in the family relation the grantor retains the beneficial use and enjoyment of the property conveyed and thereby deprives his creditors of a valuable right. (*Moritz v. Hoffman,* 35 Ill. 553; *Bittinger v. Kasten,* 111 Ill. 260; *Jones v. King,* 86 Ill. 225; *Springer v. Bigford,* 160 Ill. 495; *Morrill v. Kilner,* 113 Ill. 318; *Higgins v. Higgins, supra; Gordon v. Reynolds,* 114 Ill. 118, 127; *Lowentrout v. Campbell,* 130 Ill. 503; *Jarvis v. Jarvis, supra; Hauk v. Van Ingen,* 196 Ill. 20, 37; *Highley v. American Exchange Nat. Bank,* 185 Ill. 565; *Frank v. King,* 121 Ill. 250.) Where it appears that the conveyance was made in anticipation of debts or to avoid debts already incurred, the conveyance is fraudulent, as a continuing fraud as against either existing or subsequent creditors. (*Patterson v. McKinney,* 97 Ill. 41, 47; *Tunison v. Chamblin,* 88 Ill. 378; *Kennard v. Curran,* 239 Ill. 122; *Bongard v. Block,* 81 Ill. 186, 187; *Continental Portland Cement Co. v. Koch,* 211 Ill. App. 94; *McKey v. Cochran,* 262 Ill. 376; *Dillman v. Nadelhoffer,* 162 Ill. 625.) Subsequent creditors may impeach a voluntary settlement on the ground of prior indebtedness if they can show ante-

cedent debts sufficient in amount to afford reasonable evidence of a fraudulent intent; they are not obliged to show absolute insolvency of the person making the settlement; it is enough to show him deeply indebted. Wait on Fraudulent Conveyances, sec. 97, page 196. A grantor engaged in or about to become involved in hazardous business ventures will not be permitted to shift the loss of his venture to his creditors by making a voluntary conveyance to a near relative, so as to enjoy all the benefits of the property, and at the same time place his property beyond the reach of his creditors. (*Morrill v. Kilner, supra; Highley v. American Exchange Nat. Bank, supra; Continental Portland Cement Co. v. Koch, supra; Eames v. Dorsett*, 147 Ill. 540; *Bridgford v. Riddell*, 55 Ill. 261, 264; *Moritz v. Hoffman, supra*.)

"Since one to whom a debt accrues has the right to expect that his debtor has dealt fairly with him, a conveyance is void as to subsequent creditors if the grantor executes it in expectation of shortly contracting debts, and with the design of so placing the property conveyed that if misfortune befall him and he becomes unable to pay his debts, it shall be beyond the reach of his creditors." (27 Corpus Juris, page 521, sec. 199.) "Where a conveyance is made with a view of entering a new and hazardous business, the risk of which the grantor intended should be cast upon the parties having dealings with him in the new business, it is fraudulent as to subsequent creditors." (27 Corpus Juris, page 522, sec. 200.)

In *Jones v. King, supra,* the court held: "It is, however, insisted by appellants that appellees not having been creditors at the time of the conveyance, they cannot assail it. We understand the rule to be settled that where the conveyance is colorable merely, and a secret trust and confidence exists for the benefit of the grantor, the conveyance will be held void both as against precedent and subsequent creditors. This is

the doctrine of Bump on Fraudulent Conveyances, page 319, where it is said: 'If a conveyance is merely colorable and a secret trust and confidence exist for the benefit of the grantor, it is void, not only against precedent but subsequent creditors; for it is in such case a continuing fraud and may actually operate as such, as well in reference to debts contracted after as before the conveyance.' "

It is urged that the conveyance between appellants is a bona fide transaction because the deed was placed of record prior to the time appellant incurred the debt to appellee and that appellee had knowledge of the conveyance when he accepted the note. In *Sparrow v. Wilcox*, 272 Ill. 632, the court held: "Section 30 of the Conveyances Act, providing that deeds and mortgages shall take effect from and after filing the same for record, as to creditors and subsequent purchasers without notice, has no application in determining whether a judgment creditor can enforce his lien against land subsequently acquired by the judgment debtor by fraudulently inducing the owners to execute a deed to him."

It is further insisted that appellant had shares of stock in the Magnestone Corporation at the time of said transfer, the value of which he had reason to believe was sufficient to pay his debts. We cannot agree with this contention. This stock was purely speculative and had no actual value. As the court said in *Dillman v. Nadelhoffer, supra:* "Retention by a debtor, at the time of making a voluntary conveyance to his wife, of property of a speculative and uncertain value, consisting of shares of capital stock and credits upon the books of a corporation, which events soon after demonstrated to be insufficient to pay his debts, will not relieve the conveyance of its fraudulent character as to creditors. . . .

"The next contention is, that even regarding the conveyance as a voluntary settlement upon the wife,

Lewis E. Dillman was at the time in good circumstances and had ample property left to pay all his debts,—that in fact he had no indebtedness except the contingent liability to appellee. After a careful consideration of the evidence we are forced to the same conclusion reached by the trial and Appellate Courts. The property of Dillman consisted in shares of capital stock of uncertain value in two incorporated companies, and credits on their books. The stock soon declined in value. His shares in the only one that paid any dividends became worthless by the failure of the company, and the other stock he disposed of, at a small percentage of its face value, in payment of a debt created after the guaranty of the notes to appellee. Judged by the results he wholly failed to retain in his hands sufficient property to meet his obligations. This is conceded, but counsel insists that the question whether he retained property amply sufficient to pay all of his debts then existing must be determined from the evidence showing what the value of the property was at the time of the transfer, and not from its sufficiency as shown by the final result as ascertained several years afterward. This is, to a certain extent, true, but the whole evidence bearing upon the question must be considered.''

In Wait on Fraudulent Conveyances and Creditor's Bills, 3rd Ed., there is a footnote as follows: ''*Black v. Nease,* 37 Pa. St. 438. 'The law should not be so framed or construed as to tempt men to desert their legitimate business and engage in specious and hazardous speculations concerning the dangers of which they are ignorant, by allowing them to ''make a feather bed on which they may fall lightly'' under the plea of affection for their wives and children.' ''

Finding no error in the record, the decree of the circuit court of Sangamon county is affirmed.

*Affirmed.*

ELDREDGE, J., took no part in this case.